DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
CLEMENT S. ROBERTS (SBN 209203)
croberts@durietangri.com
LARA A. ROGERS (SBN 261748)
lrogers@durietangri.com
BRIAN C. HOWARD (SBN 268852)
bhoward@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: 415-362-6666
Facsimile: 415-236-6300

Attorneys for Defendant
QUANTUM CORP.

GOODWIN PROCTER LLP
GREGORY S. BISHOP
gbishop@goodwinprocter.com
THOMAS F. FITZPATRICK
tfitzpatrick@goodwinprocter.com
CHARLES F. KOCH
ckoch@goodwinprocter.com
DANIEL W. RICHARDS
drichards@goodwinprocter.com
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: 650-752-3100

Attorneys for Defendant
NETAPP,INC.

ROPES & GRAY LLP
JESSE J. JENNER (*pro hac vice*)
jesse.jenner@ropesgray.com
KHUE V. HOANG
khue.hoang@ropesgray.com
JOSEF B. SCHENKER (*pro hac vice*)
josef.schenker@ropesgray.com
1211 Avenue of the Americas
New York, NY 10036
Telephone: 212-596-9000

ROPES & GRAY LLP
JAMES BATCHELDER
James.batchelder@ropesgray.com
MATTHEW R. CLEMENTS
matthew.clements@ropesgray.com
1900 University Ave, 6th Floor
East Palo Alto, CA 94303
Telephone: 650-617-4000

Attorneys for Defendant
EMC CORPORATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

COMPRESSION TECHNOLOGY SOLUTIONS LLC,

Plaintiff,

v.

EMC CORPORATION, NETAPP, INC., AND QUANTUM CORP.,

Defendants.

Case No. 5:12-cv-01746-RMW

**DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

Date: November 2, 2012
Time: 9:00 a.m.
Ctrm: Courtroom 6 - 4th Floor
Judge: Honorable Ronald M. Whyte

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION .....1

MEMORANDUM OF POINTS AND AUTHORITIES .....1

I. INTRODUCTION .....1

II. BACKGROUND .....2

III. ARGUMENT .....4

A. Invalidity Under Section 101 Is A Threshold Legal Issue. .....4

B. Claims 9-12 Are Directed To Abstract Mathematical Calculations. .....5

C. Claims 2-3 Are Invalid Under Both Section 101 And Section 112(f). .....9

1. The Means + Function Limitations Lack Corresponding Structure. .....10

2. Claims 2-3 Are Impermissibly Abstract. .....12

IV. CONCLUSION .....14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008)....................10

*Bancorp Servs., L.L.C. v. Sun Life Assurances Co. of Canada*,
687 F.3d 1266 (Fed. Cir. 2012).................... passim

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010)....................1, 4, 8

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007)....................12

*CLS Bank Int'l v. Alice Corp.*,
685 F.3d 1341 (Fed. Cir. 2012)....................4, 13

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011)....................8, 9

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012)....................9

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005)....................11

*Digital-Vending Servs. Int'l. v. The Univ. of Phoenix*,
672 F.3d 1270 (Fed. Cir. 2012)....................9

*Exxon Res. & Eng'g Co. v. United States*,
265 F.3d 1371 (Fed. Cir. 2001)....................10

*Fort Props. v. Am. Master Lease*,
671 F.3d 1317 (Fed. Cir. 2012)....................9, 13

*Gottschalk v. Benson*,
409 U.S. 63 (1972)....................13

*In re Abele*,
684 F.2d 902 (C.C.P.A. 1982) ....................13

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008)....................4, 13

*Kemco Sales, Inc. v. Control Papers Co.*,
208 F.3d 1352 (Fed. Cir. 2000)....................11

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
No. C-12-1233 EMC, 2012 WL 3985118 (N.D. Cal. Sept. 11, 2012) ....................5

*Parker v. Flook*,
437 U.S. 584 (1978)....................4, 13

*SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010) ..... 4

**Statutes**

28 U.S.C. § 1404(a) ..... 2

35 U.S.C. § 101 ..... passim

35 U.S.C. § 112 ..... 1

35 U.S.C. § 112(f) ..... passim

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 2, 2012, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Ronald M. Whyte, United States District Court, San Jose Courthouse, 280 South 1st Street, San Jose, CA 95113, Defendants Quantum Corp. ("Quantum"), EMC Corporation ("EMC"), and NetApp, Inc. ("NetApp") (collectively "Defendants") will move the Court for summary judgment that Claims 2-3 and 9-12 of U.S. Patent No. 5,414,650 ("'650 patent") are invalid pursuant to 35 U.S.C. Sections 101 and 112. The asserted claims of the '650 patent are drawn to a method for processing "input packets" in an information stream into "output packets." The method requires no machine or transformation, calls for no computer, could be performed purely in the human mind (or with a pencil and paper), and falls outside the scope of patentable subject matter. The patent also lacks corresponding structure for the means-plus-function limitations in Claims 2-3.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Patent law protects only concrete and tangible inventions: processes, machines, articles of manufacture, and compositions of matter. *See* 35 U.S.C. § 101. It does not protect abstract ideas or concepts. *Bilski v. Kappos*, 130 S. Ct. 3218, 3229-30 (2010). The claims asserted in this case are not limited to any specific machine, and do not transform an article to another state or thing. Instead, they are directed to the abstract idea of parsing the "input packets" in an information stream into "output packets" based on their internal or quantitative characteristics. Indeed, the claims are so abstract that they could be performed in the human mind, with a pencil and paper, or even with a deck of cards. The claims are not, therefore, directed to patent-eligible subject matter and are instead invalid as abstract.

Asserted Claims 2 and 3 are also invalid for the additional reason that the patent does not contain any corresponding structure for their means-plus-function limitations. This flaw, which is part and parcel of the fact that the claims are directed to abstractions, independently renders Claims 2 and 3 invalid under 35 U.S.C. §112(f).

## II. BACKGROUND

Plaintiff CTS is a wholly-owned subsidiary of Acacia Research Group, LLC, a well-known serial patent plaintiff. *See* Disclosure of Corp. Interest Certificate, ECF No. 2. On September 12, 2011 – less than a month after CTS filed articles of organization in Missouri and just four days before the America Invents Act would have made it impermissible – CTS filed suit in the Eastern District of Missouri against seven defendants. *See* Compl., ECF No. 1. Following motion practice, the case was transferred to the Northern District of California pursuant to 28 U.S.C. Section 1404(a). *See* Mem. & Order, Apr. 6, 2012, ECF No. 171.

In its Complaint, CTS alleges that all defendants infringe "at least" Claim 9 of the '650 patent. *See* Compl. ¶¶ 23-27 (as to EMC); ¶¶ 36-39 (as to NetApp); ¶¶ 40-43 (as to Quantum). CTS does not specify whether the Defendants' infringement of Claim 9 is alleged to be direct or indirect, literal or under the doctrine of equivalents. *Id.* CTS has since further alleged that various defendants infringe Claims 2-3 and 9-12. ECF No. 209 at 2. Of these, Claims 2, 9, and 11 are independent.

Claim 9, which is the sole claim mentioned in the Complaint, reads:

> 9. An information processing method for processing an information stream comprising input packets, said method comprising
>
> receiving said information stream and receiving an indication of the boundaries in said information stream for each of said input packets,
>
> classifying said input packets according to intrinsic characteristics of said input packets or transitions in quantitative characteristics of two or more of said input packets, and
>
> parsing said input packets into output packets in response to said classifying, and
>
> generating an indication of the boundaries of said output packets, wherein each of said output packets comprises or represents one or more of said input packets.

Claim 11 is virtually identical to Claim 9, but contains additional language (emphasized below) calling for the input packets to be one or more previously parsed packets and omits the language in Claim 9 about parsing according to "transitions in quantitative characteristics":

> 11. An information processing method for processing an information stream comprising input packets, said method comprising
>
> receiving said information stream and receiving an indication of the boundaries in said information stream for each of said input packets, ***wherein each of said input packets comprises or represents one or more previously parsed packets, said previously parsed packets having been parsed according to one or more intrinsic characteristics of said previously parsed packets,***
>
> classifying said input packets according to intrinsic characteristics of said input packets, and
>
> parsing said input packets into output packets in response to said classifying and
>
> generating an indication of the boundaries of said output packets, wherein each output packet comprises or represents one or more of said input packets.

Claim 2 of the '650 patent has the same functional steps as Claim 9, but omits the language about parsing according to "intrinsic characteristics" of the packets and is claimed in means-plus-function form:

> 2. An information processor for processing an information stream comprising input packets, said information processor comprising
>
> input means for receiving said information stream and for receiving an indication of the boundaries in said information stream for each of said input packets,
>
> classification means for classifying said input packets according to transitions in quantitative characteristics of two or more of said input packets, and
>
> parsing means responsive to said classification means for parsing said input packets into output packets and for generating an indication of the boundaries of said output packets comprises or represents one or more of said input packets.

Dependent Claims 3 and 10 call for the additional step of "generating an output stream" while dependent Claim 12 calls for reiterating the process set forth in Claims 9 and 11, using the output of the first process as an input to the second.

## III. ARGUMENT

### A. Invalidity Under Section 101 Is A Threshold Legal Issue.

"Whether a claim is drawn to patent-eligible subject matter under Section 101 is a threshold inquiry" and "an issue of law." *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008), *aff'd Bilski v. Kappos,* 130 S. Ct. 3218, 3225 (2010) (describing Section 101 as "a threshold test"); *Parker v. Flook*, 437 U.S. 584, 593 (1978) (inquiry under Section 101 "must precede the determination of whether [a] discovery is, in fact, new or obvious"); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) ("Whether a [patent] claim is drawn to patent-eligible subject matter is an issue of law").

For this reason, a district court has broad discretion as to the appropriate time to decide whether a patent claim satisfies the requirements of Section 101. *See CLS Bank Int'l v. Alice Corp.*, 685 F.3d 1341, 1348 (Fed. Cir. 2012) ("[A] district court properly acts within its discretion in deciding when to address the diverse statutory challenges to validity" and may address Section 101 "before other matters touching the validity of patents."). In the present case, the Section 101 issue is ripe for decision because the validity of the asserted claims does not turn on *which* data manipulations the claims require, but rather on the fact that the claims are drawn to data manipulations *per se*. That fact is not reasonably subject to dispute and requires no discovery.

Thus, the Court may appropriately decide the Section 101 issue prior to claim construction. For example, in *Bancorp Servs., L.L.C. v. Sun Life Assurances Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012), the Federal Circuit considered a case in which the district court "declined to construe numerous disputed terms prior to considering invalidity under §101."

The Federal Circuit "perceive[d] no flaw" in the district court's approach to deciding the Section 101 issue first, and affirmed the district court's holding of invalidity. *Id.*[1]

**B. Claims 9-12 Are Directed To Abstract Mathematical Calculations.**

Claim 9 is directed to a purely abstract concept in which each step could be performed in the human mind or with a pencil and paper. Indeed, *in reading this brief* the Court has practiced Claim 9. As the Court reads this sentence, it is receiving the information on the page as a stream. That information stream includes packets (*e.g.*, individual letters and/or the words they form). The Court then mentally classifies those input packets (*e.g.*, it classifies the letters as consonants or vowels, and the words as nouns or verbs) according to their intrinsic characteristics (the shapes of the letters or the set of letters in the words) and then generates (in its own mind) an indication of where each word or sentence ends, thereby forming output packets. That is all the claim requires.

| Limitation | Sample Human Performance |
|---|---|
| 9. An information processing method for processing an information stream comprising input packets | The human mind is capable of processing an information stream (*e.g.*, text) including one that comprises packets (*e.g.*, letters or words). |
| receiving said information stream and receiving an indication of the boundaries in said information stream for each of said input packets | The human mind is capable of "receiving" a stream of information (*e.g.*, the progression of letters or words encountered in reading), including indications of the boundaries between input packets within that stream (*e.g.*, spaces between letters or words). |
| classifying said input packets according to intrinsic characteristics of said input packets or transitions in quantitative characteristics of two or more of said input packets | The human mind is capable of classifying packets of information according to intrinsic characteristics (*e.g.*, classifying letters as consonants or vowels or words as nouns or verbs)[2] or transitions in quantitative characteristics between two or more packets (*e.g.*, classifying letters as capital or lower case |

[1] Indeed, at least one court in this District has decided Section 101 eligibility at the motion to dismiss stage. In *OIP Technologies, Inc. v. Amazon.com, Inc.*, No. C-12-1233 EMC, 2012 WL 3985118, *12 (N.D. Cal. Sept. 11, 2012), the court granted Amazon's motion to dismiss, holding that the plaintiff's complaint failed to state a claim because the patent-in-suit "describes an abstract idea of price optimization and is therefore patent ineligible." *Id.*

[2] The patent makes it clear that intrinsic characteristics include the identity of an individual letter. '650 patent at 6:36-39 ("Examples of intrinsic rules include: classifying packets consisting of one ASCII character according to the specific character they contain….").

| Limitation | Sample Human Performance |
|---|---|
| | based on their height, or classifying sequential words as larger or smaller).[3] |
| parsing said input packets into output packets in response to said classifying | The human mind is capable of parsing the input packets into output packets (*e.g.*, organizing letters into words, or words into sentences) in response to the classifications it performs on the individual packets. |
| generating an indication of the boundaries of said output packets, wherein each of said output packets comprises or represents one or more of said input packets. | The human mind is capable of generating an indication of the boundaries of output packets (*e.g.*, the boundaries between words or sentences), wherein each output packet comprises or represents one or more of the input packets (*e.g.*, each word includes one or more letters, each sentence includes one or more words). |

As the chart above shows, each step of the method of Claim 9 can be performed by a person mentally manipulating a string of text. Indeed, *the patent itself* says that it is intended to apply to an "information stream" made up of packets containing "a variable length string of ASCII encoded characters terminated by a space." '650 patent at 6:19-24.[4]

Reading is not the only mental process that practices Claim 9; merely contemplating some playing cards can also meet all the steps of the claim. Consider the following graphic:







By viewing the graphic left to right, the human viewer receives an information stream comprised of input packets: individual cards. The viewer receives an indication of the boundaries of each input packet by perceiving the edges of each card. The viewer can mentally classify the cards according to intrinsic characteristics, such as number, color, and suit. And the viewer can parse

[3] The patent makes it clear that quantitative characteristics include differences in letters and the length of text strings. *Id*. at 6:59-61 ("Quantitative characteristics may be based upon quantities such as ASCII codes, numeric values of digital words, and lengths of text strings.").

[4] ASCII stands for American Standard Code for Information Exchange, and consists of the set of characters that appear on a standard keyboard. *See* http://en.wikipedia.org/wiki/ASCII.

the cards into groups, or output packets, in response to that classification. For example, the viewer can parse the cards into red and black, resulting in two output packets. The viewer generates a *mental* indication of the boundaries of the output packets by understanding that the outer edges of the first three cards form the boundary of the first output packet, while the outer edges of the remaining two cards form the boundary of the second output packet. Each of these output packets comprises one or more input packets. In the alternative, the Court could simply take a pen and draw a box around the red cards and another around the black cards. Again, using pen and paper, the Court will have generated an indication of the boundaries of the output packets in conformity with the claim.

It's also possible to classify and parse cards based on "transitions in quantitative characteristics of two or more" cards. Consider the following graphic:












Each of the cards in the above graphic has a quantitative characteristic (*i.e.*, number), according to which it can be classified. The viewer can parse the cards into output packets based on the transition in the cards' quantitative characteristics (*i.e.*, the transition from two to three). The first two cards would thus form one output packet, while the next three cards would form a second output packet. Thus, an abstract mental process—thinking about a picture of some playing cards (or the pen and paper process of drawing boxes around them)—satisfies Claim 9.

Claim 10 adds the concept of taking the result of Claim 9 and using it to generate an output stream – *i.e.*, it calls for Claim 9 wherein "said parsing generates an output stream comprising input packets parsed by said parsing and said indication of the boundaries of said input packets." If the Court reads the previous sentence out loud, it will perform this additional step because it will generate an *output* stream that includes the input packets (letters or words) the Court has parsed and an indication (in its enunciation) of the boundaries between them. Similarly, the Court could take the groups of parsed playing cards and hand them to a member of its staff. Again, in performing this action it will generate an output stream and satisfy Claim 10.

Claims 11 and 12 are similar. The only differences between Claim 9 and Claim 11 are that, in the latter, each of the "input packets comprises or represents one or more previously parsed packets," and that Claim 11 omits Claim 9's reference to classifying packets according to "quantitative characteristics." Likewise, Claim 12 calls for performing the method of Claim 9 or 11 and "reiteratively classifying and parsing said output packets to generate further output packets comprising or representing one or more packets previous classified and parsed." Thus, Claims 11 and 12 call for performing the same mental process *recursively*—using the output of the first mental process as the input of the second. Letters into words. Words into sentences. Sentences into paragraphs. Nothing about the iteration of an abstract mental process renders the process any less abstract.

This abstraction is fatal to Claims 9-12. As the Federal Circuit explained in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011):

> It is clear that unpatentable mental processes are the subject matter of claim 3. All of claim 3's method steps can be performed in the human mind, or by a human using a pen and paper. Claim 3 does not limit its scope to any particular fraud detection algorithm …. Rather, the broad scope of claim 3 extends to essentially any method of detecting credit card fraud … even methods that can be performed in the human mind.

*See also Bilski v. Kappos*, 130 S. Ct. at 3224 (invalidating claims that called for the manipulation of data relating to hedging contracts); *Bancorp Servs.*, 687 F.3d at 1280 (invalidating claims directed to "the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results"). Claims 9-12 fall outside the scope of Section 101 in precisely the same way as the claims at issue in *Bilski*, *CyberSource*, and *Bancorp Services*. The claims recite purely *computational* steps that could be performed in the human mind and which are not limited to any particular algorithm, but instead include any parsing method based on the "intrinsic" and/or "quantitative" characteristics of the data being parsed.[5] The Court should, therefore, find the claims to be invalid.

---

[5] This is intentional. Indeed, the patent is explicit that the claimed "invention may be practiced with a wide variety of processing rules." '650 patent at 3:63-65.

Indeed, *Bancorp Services* and *CyberSource* involved claims far more tangible than anything offered here. In each of those cases, the patent claim referred to computer technology programmed to implement the abstract ideas. That was not enough to save the claim in either case, because even adding general-purpose computer technology to an abstract idea does not render it patentable. *Bancorp Servs.*, 687 F.3d at 1279 ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *CyberSource*, 654 F.3d 1374 (rejecting the argument that "coupling the unpatentable mental process recited in claim 3 with a manufacture or machine renders it patent-eligible."); *accord Fort Props. v. Am. Master Lease*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) (claims held unpatentable where "computer limitation … does not play a significant part in permitting the claimed method to be performed") (internal quotation marks omitted); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1332-33 (Fed. Cir. 2012) ("computer-aided method" containing generic references to computer devices such as "remote application entry and display device" and "terminal device" rejected as unpatentable). Here, by contrast, there is nothing in the claims that even hints at any computer technology.

**C. Claims 2-3 Are Invalid Under Both Section 101 And Section 112(f).**

Claims 2-3 are similar to Claims 9-10, but are written in means-plus-function form. Thus, the only way these claims could be directed to patentable subject matter is if there were something relating to the corresponding structure for the means-plus-function limitations that brought them within the scope of Section 101. There is not.

In *Bancorp Services*, the Federal Circuit held that Section 101 applies not just to method claims, but also to system claims. In particular, it held that held that the district court "correctly treated the asserted system and medium claims as no different from the asserted method claims for patent eligibility purposes" while reiterating that "the form of the claims should not trump basic issues of patentability." *Bancorp Servs.*, 687 F.3d at 1277; *see also Digital-Vending Servs. Int'l. v. The Univ. of Phoenix*, 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012) (treating claims to a computer-readable medium as method claims: "Such functionally-defined claims should be treated as method claims to avoid exalting form over substance") (internal quotation marks

omitted). That Claims 2 and 3 are system claims should not, therefore, change the analysis of whether or not they are directed to an abstract idea.

Second, there is nothing about the means-plus-function limitations that brings Claims 2 and 3 within the scope of Section 101. Indeed, *the specification does not contain any corresponding structure* for the means-plus-function limitations in these claims. Thus, Claims 2-3 are invalid both because they are abstract *and* because they fail to satisfy the requirements of Section 112(f).

**1. The Means + Function Limitations Lack Corresponding Structure.**

A patent must clearly point out and distinctly claim what the inventor thinks he owns. 35 U.S.C. § 112(b). A means-plus-function claim is invalid as indefinite if the patent does not disclose adequate corresponding structure in the specification. *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008). Indefiniteness is a question of law that can be assessed merely by looking at the patent, and does not depend on any factual questions. *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001).

Claim 2 contains three means-plus-function limitations: (1) an "input means" for receiving the information stream; (2) a "classification means" for classifying the input packets in the information stream; and (3) a "parsing means" for parsing the input packets into output packets. Claim 3 further calls for the "parsing means" to generate an output stream containing the parsed input packets. None of these "means" has adequate corresponding structure.

The closest the patent comes to describing a structure for these "means" is in column 5, line 30 to column 6, line 14, where it ostensibly describes the "structure" of the invention. But there is no structure in that passage. Instead, the passage largely discusses Figure 1, which it describes as "a *functional* block diagram of the structure of one aspect of the present invention." '650 patent at 5:32-33 (emphasis added).[6] That functional diagram is described as showing a

[6] At 12:30-48, the '650 patent describes Figure 6 as a "functional block diagram of an alternate structure or one aspect of the present invention." This figure and passage is similar to and no more specific than Figure 1 and its corresponding description. Figure 2 also contains a number of boxes at the same level of specificity, and is described as an embodiment of Figure 1. *Id.* at 5:45-48.

"packet classifier 108" which "receives from path 102 an information stream" and "from path 104 an indication of the boundaries between input packets." *Id.* It also contains a "parser 112" which "receives from path 110 each input packet classification and passes along output 114 an indication of the boundaries between output packets." *Id.* at 5:35-42.




There is no receiving mechanism of any kind in either the passage or figure – only an illustration of a data "path" – while both the "classification means" and the "parsing means" are nothing more than black-box rectangles in an expressly *functional* diagram.

This is not a *structure* that passes muster under Section 112(f). Section 112(f) permits a patentee to express a claim element as a means for performing a specified function without reciting the structure that will perform the function. As *quid pro quo* for this flexibility, the patentee must set forth the corresponding structure in the specification, and explicitly link that structure to the claimed function to which it corresponds. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360-61 (Fed. Cir. 2000). The '650 patent fails to do this. Instead, it describes the packet classifier and the parser in *functional* terms or as the noun form of the function to which they correspond (*i.e.*, the "parser" is the "means for parsing" and the "packet classifier" is the "means for classifying" packets). That is insufficient. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (rejecting notion that a "dispenser" constituted adequate corresponding structure for "means for dispensing"). The point of Section 112(f) is to limit functional claiming by confining the patentee to the specific "structure, materials, and acts" that support each claim element. That purpose would be entirely frustrated if CTS were entitled to a means-plus-function claim that had no specific corresponding structure. *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946,

953 (Fed. Cir. 2007) (means-plus-function claim invalid where no specific structure shown; allowing patentee to point generally to known methods "would vitiate the language of the statute").

**2. Claims 2-3 Are Impermissibly Abstract.**

The only *possible* structures in Claims 2 and 3 are the "information processor" mentioned in the preamble and (to the extent there is any) the "corresponding structure" for the three means-plus-function limitations. As discussed above, however, there is no corresponding structure for the means-plus-function limitations. And the reference to an "information processor" in the preamble does not require the use of a computer as opposed to, say, a human mind. Thus, the claims are not tied to any particular structure (or "machine") that could bring them within the scope of Section 101 and are invalid for the same reasons as Claims 9-11.

Even if one assumes, *arguendo*, that Claims 2-3 require a computer, they would still be impermissibly abstract because they would be directed to pure mathematical manipulations on a general purpose computer. In *Bancorp Services*, the Federal Circuit explained that "[t]o salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." 687 F.3d at 1278. The claims at issue in *Bancorp Services* fell short of this requirement because, in those claims, "the computer simply performs more efficiently what could otherwise be accomplished manually." *Id*. at 1279. As the Court put it, "the computer merely permits one to manage a stable value protected life insurance policy more efficiently than one could mentally. Using a computer to accelerate an ineligible mental process does not make that process patent-eligible." *Id*.

Insofar as Claims 2-3 call for a computer at all, the principles articulated in *Bancorp Services* are directly applicable. As evidenced by the parallel Claims 11-12, the *functions* recited in Claims 2-3 can be performed purely in the human mind and without the use of a computer. Indeed, the fact that the '650 patent recites the same functions in these two sets of claims demonstrates that any computer that might be required by Claims 2-3 is used merely to "accelerate an ineligible mental process."

The same principle is reflected in *CLS Bank International*. In that case, the Federal Circuit distinguished between "[t]he mere implementation on a computer of an otherwise ineligible abstract idea" and cases in which the addition of a computer "impose[s] a meaningful limit on the scope of a claim, and plays a significant part in permitting the claimed method to be performed, *rather than functioning solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e.*, through the utilization of a computer for performing calculations." 685 F.3d at 1351 (emphasis added). Insofar as Claims 2-3 require a computer, however, that is *precisely* the way they use them – *i.e.*, as a mechanism for performing the same data manipulations called for in Claims 11-12. *See also Fort Props.*, 671 F.3d at 1323-24 (claims invalid under Section 101 where the applicant "[s]imply add[ed] a computer limitation to a claim covering an abstract concept"); *In re Abele*, 684 F.2d 902, 909 (C.C.P.A. 1982), abrogated on other grounds *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) ("[T]he burden [is] on the applicant to demonstrate that the claims [were] truly drawn to [a] specific apparatus distinct from other apparatus capable of performing the identical functions.").

The Supreme Court's decisions also support this conclusion. In *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972), for example, the Court rejected claims directed to an algorithm for converting binary numbers into a different format. According to the Court, the claims ran afoul of Section 101 because they were directed to an algorithm for use on a computer. *Id.* at 71-72 (noting that in light of the reality that such algorithms were only useful on a computer, the "practical effect" of the claims "would be a patent on the algorithm itself."). *Id.* at 72. Thus, to the extent Claims 2-3 even require a computer, they are unpatentable under the principles set forth in *Gottschalk*.

Similarly, in *Parker v. Flook*, 437 U.S. 584, 585 (1978), the Court considered a claim in which "[t]he only novel feature of the method is a mathematical formula." The Court found that such a claim was unpatentable "under Section 101, not because it contains a mathematical algorithm as one component, but because once that algorithm is assumed to be within the prior art, the application, considered as a whole, contains no patentable invention." *Id.* at 594. Again, the claims at issue here fail under this analysis; once any abstract algorithms are set aside, there

is *nothing* left in Claims 2-3 other than (at most) an unpatentable, totally conventional general-purpose computer. That is not enough to survive a challenge under Section 101.

## IV. CONCLUSION

For the foregoing reasons, and as discussed above, the Court should find that all asserted claims are directed to unpatentable subject matter and that Claims 2-3 fail to satisfy the requirements of 35 U.S.C. Section 112(f). The Court should, therefore, enter summary judgment of invalidity.

Dated: September 17, 2012

DURIE TANGRI LLP

By: *_/s/ Clement S. Roberts_*
CLEMENT S. ROBERTS

Attorneys for Defendant
QUANTUM CORP.

Dated: September 17, 2012

ROPES & GRAY LLP

By: *_/s/ Khue V. Hoang_*
KHUE V. HOANG

Attorneys for Defendant
EMC CORPORATION

Dated: September 17, 2012

GOODWIN PROCTER LLP

By: *_/s/ Gregory S. Bishop_*
GREGORY S. BISHOP

Attorneys for Defendant
NETAPP, INC.

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Clement S. Roberts, attest that concurrence in the filing of this document has been obtained.

Dated: September 17, 2012

*_/s/ Clement S. Roberts_*
CLEMENT S. ROBERTS

**CERTIFICATE OF SERVICE**

I certify that all counsel of record is being served on September 17, 2012 with a copy of this document via the Court's CM/ECF system.

Dated: September 17, 2012

*/s/ Clement S. Roberts*
CLEMENT S. ROBERTS